Battery, do we have all the attorneys for this first case? Okay. So we have four appeals to hear this morning. My colleague, Judge Joe Parnar, very pleased to welcome our colleague from the Northern District of Alabama, Chief Judge Scott Kugler, to assist us this week for a couple of days. Judge Kugler has been on the bench a long time and this is not his first time to sit with us, but for a long time we were waiting for our new member. We now have the one vacancy on our court that's been filled, which we're very pleased about. But because it took so long, we've been backfilling in slots on our oral argument calendar with visiting district judges from our own circuit to assist us. And we very much appreciate it when they take on that responsibility of doing some work over and above the work that they already have on the district docket. On top of that, Chief Judge Kugler, of course, not only serves as the Chief Judge of the Northern District of Alabama, but he also serves on the Executive Committee for the Judicial Conference of the United States. So he's super busy and that makes us even more appreciative of his willingness to help us this week. Counsel, we're familiar with your cases. We've read your briefs, the authorities cited in your briefs, at least portions of the record. You don't have a lot of time this morning, so you should feel free to get to the heart of the arguments that you want to make sure that we've heard and considered this morning. We're probably going to have some questions. There's a traffic light system, green, yellow, red. When the red light shines, it is time to stop. Please be mindful of our time. Now, if you're answering a question from the court, you may continue to answer our questions. But otherwise, please wrap it up. If you're answering questions from the court and you have rebuttal time, you won't lose any rebuttal time by going over and answering our questions. We gave extra time for the first case because there are so many defendants and issues. So let's move to that one. Mr. Woolridge, will you come speak with us, please? Good morning, Chief Judge Pryor, and may it please the court. My name is Thomas Woolridge, and I will be presenting the apprendee argument for the error occurred in this case. There's a lot of doubt. I have doubt. It seems to me an apprendee error occurs when a district court makes a finding of fact and a punishment is increased as a result of that finding of fact. Now, as I understand it, a jury made a finding of fact here. Now, there's a question about whether the jury found the facts necessary to increase the punishment based on the verdict form and the instructions that were given it. But there's no doubt that the jury made a finding of fact, not the judge. What am I missing? Chief Judge Pryor, the jury returned a verdict that said murder was in the conspiracy, but murder... That it involved murder. Yes, Your Honor. That's the finding of fact that's necessary to increase the punishment, is it not? No, Your Honor. The finding of fact necessary to increase the punishment is that the defendant was found responsible for something that carried a life sentence. Murder in this case... What is the fact that a jury has to find? The jury has to find that there was an overt act involving murder in the conspiracy. That it involved murder. Yes, but murder... The jury made a finding of fact that it involved murder. That's true, but you're missing the point here, because murder was defined in the instructions as carrying offenses that have less than life sentences. There we go. Yes. Now we're talking about what I think is the issue, which is whether you think the jury instructions were adequate and the verdict form were adequate. Your Honor... But the jury made a finding of fact. They made an insufficient finding of fact. They made an ambiguous finding of fact. Because, you say, that you make that argument depends on how we read the instructions and the verdict form. Isn't that right? Yes. You look at the special verdict form in light of the jury's instructions on it. And in this case, the government... And you didn't object to the verdict form. There was nothing object... Well, actually, Your Honor, there were objections to the verdict form. Not this argument. I'm sorry? Not this argument. Your Honor, we weren't attempting to solve an apprendi problem with the verdict form, because an apprendi problem doesn't happen until sentencing. United States v. Candelario was very clear. This court said that you don't object to an apprendi issue until sentencing. So we weren't trying to solve an apprendi issue... What did you think that the verdict form, the special verdict for this finding was... What was the point of that? Right. So the... So here's what happened. You didn't know where that was going? No. We knew where it was going, but we also know that there's no obligation for us to save the government when they draft an overbroad indictment, seek overbroad jury instructions, and send a nonspecific verdict form to the jury. Here, the government drafted an indictment... I thought that district court is the one who sends the verdict form to the jury. I didn't know the government did that. This district court actually drafted the verdict form, and then the government and the defense both said this verdict form was fine. Right. And went with it. Right. Because the verdict form was fine, essentially. There was no apprendi error that the verdict form solved. Your Honor, the government indicted this case from the very beginning. I mean, it seems to me, Mr. Wooldridge, that what we really have here is arguments about jury instructions and a verdict form, neither of the objections to which were never made. So we would be on plain error review, but it's masquerading as an apprendi error in an attempt to get constitutional harmless beyond a reasonable doubt review. And the thing we have to figure out is, really, what is the argument here, and what is the appropriate standard of review? Yes, Your Honor. The appropriate standard of review is de novo. The reason it's de novo is because, first, this was a timely apprendi objection, because Candelario says apprendi objections are timely when they occur at sentencing. For Your Honor, to find otherwise would be to essentially carve out an exception or even reverse the United States v. Candelario. This was an apprendi problem. That's only true if the jury didn't make the finding of fact that is necessary to increase the punishment. The jury did not. And the jury did make the finding of fact. They did not. We have a verdict form that says they did. Your Honor, Your Honor, if you – the jury was asked if murder was in the conspiracy, and murder was defined as attempted murder, which carries a 30-year sentence and is not sufficient to enhance, that's what happened in this case. It was conspiracy to involve murder. Yes. Therefore, when the jury returned the verdict, we don't know if the jury found malice murder, conspiracy to murder, or attempt to murder, because the government sought jury instructions which defined murder as involving all three. Now, that's within their realm of – they drafted overbroad indictment and asked for broad jury instructions. And that is their strategy. That's what they wanted. It makes it easier to get a conviction when you define murder as conspiracy. It's easier to find conspiracy than actual murder. And in this case, the jury acquitted on the only vicar murder in the indictment. Counsel, can I ask a question? Yes, Your Honor. Isn't everything that you're talking about right now, wasn't it within your knowledge at the time the jury instructions were given? Was it within our knowledge that the indictment was broad? Yes. Yes. Was it within your knowledge everything that you've argued to us today? There was nothing objectionable about it, Your Honor. Yes, it was in our knowledge. Could you – if, in fact, you had raised this objection to the judge and said, Judge, we have a problem here because the way you've instructed it, the way the government's argued it – I think that was also part of your case – and when it goes with the verdict form itself, we need to have a further instruction to remedy this to get the answer. Could you have done that or not? But you – Back up to the mic. You disappeared from the mic. Yeah, you need to get – Yeah, there you go. And had you asked that – well, it's too late after the jury's excused to ask that question, isn't it? Your Honor, you're asking me to solve an apprentice problem before it occurs. Did you hear my – That's not what Candelario says. I'm sorry, counsel. Did you hear my question? I believe your question and you're asking me could we have objected, could we have tried to solve the problem beforehand. Is it too late after the jury's excused to ask that question? To ask what question? How to fix it, to ask the jury, to give them further instructions and resolve the issue that you're raising here. Your Honor, the apprentice problem did not occur before sentencing. And do you understand my question? I did. You're asking me if I could have fixed jury instructions or if I could have objected to the indictment. And I'll point, Your Honor, to the United States v. Candelario, which says I do not have to do that. It says – Which dealt with a judge issue, not a jury issue. Yeah. Isn't that correct, counsel? Your Honor, this is a judge issue because the judge – Counsel, I don't – I apologize. I must not be clear. Okay? I asked you the question. Wasn't that a judge issue that court was dealing with? In Candelario? Yes. Yes. And so is this. All right. All right. You believe it's a judge issue because the jury instruction when read along with the government's argument and the verdict form itself is insufficient? You believe that's just strictly a judge at sentencing time issue? No, Your Honor. I believe – what I believe is the indictment was fine, the jury instructions were fine, and the jury verdict was fine. What was wrong is when Judge Thrash used that ambiguous verdict in order to enhance the sentence over 20 years when he shouldn't have been allowed to do that. Okay. The reason that's true is because the government is allowed in their indictment to define murder as broadly as they want to. There's no problem with finding murder, conspiracy, and attempt as murder. And there's no problem with the government doing that in jury instructions as well. There's also no problem with them asking in a special verdict form if murder is involved. But when the special verdict form said that it involved murder. Yes. No problem with that. What was the point of that finding of fact by the jury? Well, that is a question of error in the government's – No, no, no. Let's say that there had been a proper instruction, okay? That verdict form would have resulted in a finding of fact by a jury for one purpose. Right. Right? Yes. To enhance that sentence, right? Yes. Right? Right. And your argument is that we have an apprendee error, a judge error that occurs after the fact because the jury wasn't instructed properly. No. The jury was instructed fine. Not in a way that would support that special verdict finding. That is perfectly fine. The government is allowed to proceed in a racketeering case without seeking enhancements. In this case, they asked the jury if murder was in the conspiracy, but they defined murder so much that it made the question irrelevant. As such, when the judge used that finding to sentence Mr. Clayton and others to over 20 years, apprendee was violated. There's no obligation under Candelaria to object to indictments and verdict forms and things like that. We don't have to save the government from its own strategic mistakes. Okay. Mr. Woldridge, I think we understand your argument. You saved two minutes for rebuttal. Let's hear from Mr. Wilson. Good morning. May it please the Court. Vancito Gumbs is unique in this case in several important respects, Your Honors. And because of those uniquenesses with respect to Mr. Gumbs,    It's a very important part of this case. and the sentence as to him would affect a dramatic expansion of the law of RICO conspiracy. First, Mr. Gumbs had no involvement in any act of violence in this case. There was no evidence of it. There was no allegation of it. Second, all the acts of violence in this case occurred prior to the earliest evidence of involvement of Mr. Gumbs in this conspiracy at all. The only evidence of Mr. Gumbs' involvement was his relationship and conversations with Kevin Clayton. All the acts of violence in this case occurred before the earliest evidence of Mr. Gumbs' involvement. Therefore, and yet, per the jury charge in verdict form, he was convicted of RICO conspiracy involving murder. Therefore, Your Honors, affirmance of the conviction, of his conviction in sentence for RICO conspiracy involving murder would produce the following new law. A person who conspires in a nonviolent crime with any member of a RICO enterprise is responsible, at least in sentencing, for any acts of violence by that enterprise, including murder, that occurred in the past, before the person's involvement with the enterprise, including where no murder occurred at any time during his involvement. That's the law in this case if this conviction and sentence are affirmed with respect to Mr. Gumbs. Surely that can't be the law, Your Honors. And yet, that's exactly what the law would be if his conviction is affirmed. And, Your Honors, I did object to the verdict form. And I did object. On this ground? Yes, Your Honor. I objected to the jury charge and I objected to the verdict form. I submitted my proposed jury charge and I submitted my proposed verdict form. You said that in the event that the judge gives this instruction, these instructions, and submits this verdict form, my client will be subject to an apprendiary? No, Your Honor. I submitted the form, the verdict form, and, well, yes. And also, but specifically with respect to Mr. Gumbs, the verdict form would require a specification by the jury of which murder it found Mr. Gumbs' involvement to have been in connection with because there was none. None occurred during the time, the evidence of his involvement in the conspiracy. That's why I asked for that verdict form. And that's why, Your Honors, also I asked for, I asked that the jury charge be modified so that it would apply prospectively and not retroactively. And I talk about this on page 20 to 22 of my brief. I said that the court charged that for racketeering activity types, you must unanimously decide whether the defendant joined or remained in the RICO conspiracy knowing that the enterprise engaged in this type of racketeering activity. Past tense. I said, I believe the more proper phrasing is the defendant joined or remained in the RICO conspiracy knowing that the enterprise would engage in this type of racketeering activity rather than it engaged in it. I think there's a requirement that the defendant must join or remain in the RICO conspiracy knowing that these things would happen in the future, not merely that they had happened in the past. I also said in an argument with the court, it can't be just the past. I can't be responsible for something that was done in the past before I joined if that never happened again while I'm in the conspiracy. Mr. Gumbs is unique in this case, in this respect, certainly among these appellants. Mr. Gumbs cannot be said to have waived this issue. On the contrary, I raised it repeatedly. I raised it during the charge conference. I raised it after the evidence in which I asked for a ruling that the evidence was insufficient of a murder-related conspiracy with respect to Mr. Gumbs as a matter of law for the reason I said here. And I raised it at sentencing. And yet Mr. Gumbs, in all these circumstances, was— Chancellor, you're saying there was no evidence of a murder after he joined the conspiracy? Correct. The last murder was August 2005, early August of 2005. Undisputed when he joined it? I'm saying— And you're saying it's undisputed when he joined it? It's the earliest. I'm saying the earliest evidence in the case of Mr. Gumbs, and it's interesting to note what that evidence is. The earliest evidence of involvement was a telephone intercept of Mr. Clayton's telephone. They were up on his line, and Mr. Gumbs became a conversant with him on the phone. What Mr. Gumbs said— What did the indictment allege in terms of his joining the conspiracy? It alleges—it doesn't allege specifically, but furthermore, it doesn't allege any specific crime of Mr. Gumbs. It's just a RICO conspiracy. The government said he provided information to Mr. Clayton about ongoing investigations. And here's what that was. That was the first intercept. Mr. Clayton said, what is this case? And Gumbs said this. It looks like it's a RICO conspiracy. He checked his tablet in his car. He said, it looks like a RICO conspiracy case. And he said, it says something about the hate committee, but that can't be us. That's not us. The hate committee is them. That shows that even as of that earliest intercept, he didn't know what the hate committee was. What was the timing of the text messages where he referred to being a hitman and the shooter? Those were also after the last murder. That was the end of August, end of August 2015. The message doesn't contain a date. The government in its indictment alleged it to be on or about August 25th or 27th, 2015. In fact, there's not a date on the text. But the last murder, I mean, all the murders, every violence in this case, all the violence in this case occurred before that. Okay. Earliest. You say—do you have any other questions? No. You've saved a couple minutes. Let's hear from Mr. Lovell. Thank you, Your Honor. Good morning. May it please the Court. The evidence presented at trial demonstrated the fact that Mr. Walton did not possess the intent to cause death and serious bodily harm. More importantly, he ordered his co-defendants not to harm the victim, Mildred Frederick. It was a robbery. It was an armed robbery. I'm completely comfortable admitting that. It was orchestrated by my client. However, there was not proof of that additional element, the intent to cause death and serious bodily harm. Even in the light most favorable to the government, in drawing all reasonable inferences in favor of the jury's verdict, this cannot be shown. The facts and every shred of evidence at trial support my view. Three people testified. FBI agent Paul Szabo, Mildred Frederick, and Ladaris Dickerson. Now, I have spelled out their statements in great detail, both in my initial brief and then via bullet points in my reply brief. But I'm not going to recount each and every one of those statements for you now, unless you want me to. But you've been provided those in writing. I will remind the court that Mildred Frederick and Mr. Walton were friends prior to this. As a matter of fact, when Mildred Frederick failed to put oil in her automobile, she came to Mr. Walton and asked for his assistance in committing insurance fraud. Mr. Walton was willing to do that. He brought the vehicle to a remote area, burned it quite thoroughly, and Ms. Frederick successfully filed her insurance claim. When those insurance proceeds came in, Ms. Frederick added some additional money to that, and she went to the market to buy a car. Her boyfriend and the co-defendant in this charge, who was actually given a deal and testified, but he did not go to trial, arranged with Mr. Walton for Ms. Frederick to come to the middle of a parking lot in a visible area, not a secret area, where if there was an intent to cause harm, they would be more likely to be seen, but to a non-secluded area, to a very open and public area. Agent Szabo, in watching this transact, they had been listening to cell phone calls, and they knew this was going to happen, and he watched it. Now, he has a duty. If he believes a violent crime is occurring and somebody's life is in danger, he has an obligation to act. He did not act. He observed it, as did Mr. Walton, by the way. Mr. Walton was in the vicinity watching the entire crime go down. Now, this is every single case that I have found that raises this challenge, going all the way back to the Supreme Court in the Holloway case. The Holloway case. Yes, Your Honor. You cited it. You cited it for the proposition that, I believe anyway, correct me if I'm wrong, that, quote, that merely using a gun to frighten a victim was not sufficient to prove such intent to kill or cause bodily harm. That's your cite to the Supreme Court case in Holloway, right? Yes, Your Honor. Well, in fact, wasn't the Supreme Court actually quoting the district court's jury instructions then, and they didn't quote that with approval? They just quoted what it was. Yes, as the government pointed out in their— Why did you argue that? Why did you put that in your brief? Judge, I understand that I may have taken that out of—that that may be out of context, so I'm prepared to explain what Holloway did say this morning. That's why I guess it's— Well, there was a gun present. There was a gun present. Shown to anybody? It absolutely was. Out of the car when it was moving? No. She was—she was—there's no testimony of the speed that the car was moving. She was pushed out. You said thrown. I'm going to be literal. Pushed out. She was pushed out of the car— While it was moving. Excuse me? While it was moving. It appears that it was—there is testimony that it was moving, yes. And she tried to fight back, and one of her complaints was that her co-defendant didn't help, but actually turned the money over to him. Is that correct? That is correct. But is the jury—the jury heard all this testimony? They did. Are you not free to conclude that the firearm being there, utilized to get the cooperation of the victim and her being pushed out of the car, that that wasn't demonstrative of the intent necessary in the crime? I would agree in any other case, Your Honor, if it was standing alone. And that's every case that I have found we have that sort of action, standing alone. This is a unique case where Ms. Frederick and Mr. Dickerson said he was instructed not to harm her. So that is a—those are facts that makes this a unique case that you could rule in my client's favor without setting any precedential value because the chances of this fact scenario arising again are somewhere between slim and nil. When the evidence is before a jury like this, is it really our duty to second-guess a jury when they've heard these facts and made a decision? I would say that there are certainly cases where this Court has found the evidence was insufficient. Does that make it our responsibility and really our job to do that? It makes it your obligation to determine whether that would be in keeping with justice, whether that's the right thing to do. I'm not asking to go as far as Justice Scalia and Justice Thomas urged in their dissenting opinions to say that let's just follow the law. The law really says you've got to commit. Well, it's a good idea not to try to get us to follow dissents. No, and I'm not. And, Judge, hear me, Chief Judge Pryor. I'm not saying that. I'm saying I don't want you to go that far. I'm pointing it out. What I'm asking you to do is do something that would be very difficult for a jury to do in this situation when you have all of the elements of a robbery. But it's this additional element that's very difficult. It would be very difficult for a jury to look at this and say they used force, they threatened with a gun, the presence of a gun, but there's this other evidence that said they did not have the requisite intent. But isn't that why we have juries, to hear facts when they're presented that are in conflict with each other and make determinations about what the truth is? I would suggest, Judge, that that is certainly why we have juries, but it's also why we have courts of appeals, because courts of appeals have overruled and overturned juries. It doesn't happen every day, but it does happen. So, clearly, it's within your right, within your realm, within your authority to act and to grant the relief request. I'll give you the fact that circuit courts have overruled juries before. I'm not prepared to give you the fact that it's proper in this case. I understand that, Judge. But I would urge you, again, to look at the unique facts and hold, as your two colleagues on the bench here today found in the Garson case, that words have meaning. And I understand that the jury, my argument is essentially that the jury didn't attach the proper meaning to those words. Okay. I think we understand your argument. Let's hear from Mr. Mulrow for the government. Thank you very much, Judges. Good morning. May it please the Court. Connor Mulrow for the United States. I was one of the prosecutors at the trial level and pleased to present argument on behalf of the government this morning. Turning first to the RICO sentencing issue, I want to lay out three approaches that this Court could take, all of which result in the affirmance of the enhanced sentences below. And those are first, invited error, second, plain error, and third, harmless error. Starting with invited error, I think that to the extent the defendants have identified any problems with what went on below, Mr. Chief Judge, as you, I think, identified earlier, those lay in the instructions and in the verdict form. And specifically, they lay in this phrase that the defendants have identified, acts involving murder, which they argue was broadened by the instructions to include predicate offenses not punishable by life. Now, that phrase, acts involving murder, is one that the defendants themselves, on multiple occasions, submitted to the district court as part of their proposed instructions. So we've cited in our brief docket number 2428 below. That was a proposed instruction by Defendant Walton that used that very same phrase, asking the jury to make a finding based on acts involving murder. There was also docket number 2409 that was submitted by a different defendant, Perry Green, but it was a joint submission on behalf of all the trial defendants, expressly joined by all the defendants. Counsel, let me make sure one question. Are you saying that all the defendants who argue that this was an apprendee error requested the jury instruction and approved the verdict form as it was given to the jury? Yes, Your Honor, both explicitly and implicitly. So explicitly, all of the defendants joined docket 2409, but then also implicitly, as we've noted in the briefs, the trial court implemented what it called the Phil Hill rule, by which all defendants were construed to join any objection or any motion unless they affirmatively opted out of it. And the requests and proposals that I'm citing here, they were not opted out of by any of the defendants. So we submit that they joined in those and that they all joined in invited error to the extent that the court finds invited error. So you had those two requests for the same phrase, acts involving murder. And then on behalf of Defendant Gumbs, there was a submission that Mr. Wilson made reference to during his time up here this morning. But that submission suffered from the same fault because in the proposed instruction and in the proposed verdict form, this is docket 2411, both of those invited the jury to make the sentencing finding based on conspiracy to murder, which is one of the lesser species of murder that would be insufficient to trigger the enhancement. So for all those reasons, the United States submits that this invite, this error to the extent there was one, was invited. And so not only did they fail to object at the district court level to this particular issue, they themselves brought the issue into the proceedings. Moving next to the issue of plain error and whether that is the appropriate standard for the court to apply, we submit that it is. And again, to the extent there's any error here, it's not that a finding was missing. It's that the finding was purportedly affected by the instructions in the verdict form. So the instructions in the verdict form are the relevant stage of the proceeding at which they would have objected. So this is really just your ordinary Rule 30D preserved error analysis. The point of the interrogatory, right, the special verdict form about whether the conspiracy involved murder was what? The point of the interrogatory was to trigger the enhanced sentence on a second instance. Did it have any other purpose? I certainly can't think of any other purpose. I don't know what other purpose it would serve either, right? I mean, the point was to get the jury to make a finding one way or another about the fact that would be necessary to trigger the enhancement, period. Correct, Your Honor. That's how all the parties treated it during the entire pendency of the case, frankly. That's how the court treated it throughout the trial and at sentencing. And I think that speaks volumes and separates this from Candelario. You know, Candelario is a very — What did he say about Mr. Gumbs' argument that any murder occurred before he joined the conspiracy, therefore he's in a unique position? Your Honor, I think that that is factually incorrect. And so we briefly addressed that at page 84 of our brief. But just to lay out some of the relevant facts there, it's true that the first overt act listed in the indictment is the August 25th hitman text. And that is after the last murder to be alleged, which is August 3rd murder of Robert Dixon by co-defendant Glass. But that doesn't mean that his involvement in the conspiracy didn't begin until August 25th. And there were several pieces of evidence at the trial that persuasively proved that his involvement in this conspiracy well predated that. So one of those is the testimony of one of the cooperating witnesses, Quantavious Hurt. Quantavious Hurt was a member of the hate committee, this squad of assassins. And he actually himself — Is that all caps, by the way, just as a record issue? Everybody seems to be going back and forth. Is it an acronym? Does it stand for something, hate? It's not an acronym so far as the government is aware. I don't think there was any evidence it was an acronym. But we did often see it styled in all caps. And so you'll sometimes see that. I think either one would be fine from the government's perspective. But Quantavious Hurt, you know, after testifying that I killed DeMarco Franklin and I killed Rockwell Nelson all as part of this gang, he testified that while he was still out on the streets operating as a member of hate committee, he saw Fancito Gumbs and knew him to be a member of the gang. And Quantavious Hurt was arrested pretty shortly after these murders happened. I think the record indicates he was arrested on August 10th. So if he was in a position to see Mr. Gumbs in person and to know him as a member of the gang, that certainly is more than enough for the jury to infer that Mr. Gumbs' involvement went back to the time when the murders were happening. Now, separate and apart from that, Mr. Gumbs had a tattoo of the Gangster Disciples logo. I think that they dispute that's what it is. But the jury certainly could infer that this star that you saw all over the gang's memorabilia and symbols was, in fact, signaling his affiliation with the gang. And the evidence of trial was that he had that tattoo at the time he joined the police force, well before any of these murders happened. So that's a second fact. And then third, just looking at the hitman text, I think that a fair reading of that text, slightly paraphrasing maybe, but what about the ones I killed in the streets back when I was a G.D. hitman? The phrasing of that suggests that this is retrospective looking back into the past and certainly not saying, hey, today I became a Gangster Disciple. So all those facts, I think, you know, interpreted in the light. You're not saying, though, that the text indicating some hits that might have occurred years gone by, that somehow or another that's within the period of the conspiracy, are you? I think to the extent that the text message is referring to actual murders that he completed. We didn't argue that at trial, and we're not arguing that now. But it shows that he was a member of the enterprise. And importantly, that he understood that murder, actual completed murder, was part of what this conspiracy involved. So I think that the Court's questions to my friends on the other side sort of covered a lot of the points I wanted to make on the Candelario issue. About Mr. Walton's argument. On the Carjack. Certainly, Your Honor. So this Court knows the standard to apply. You know, the jury made a verdict. It returned a verdict. And this Court will not upset that verdict, you know, absent some very high standards being met. All credibility determinations have got to stand on appeal, and all evidence has got to be viewed in the light most favorable to the government. If I understand it right, what the government had to prove was that the intent to cause death or serious bodily harm was supported by evidence that the defendant demanded or took control of the car, and he possessed the intent to seriously harm or kill the driver if necessary to steal the car. Correct. That's the holding of Holloway. It's this conditional intent. Otherwise, every federal carjacking would have to be a murder or an aggravated assault. And clearly that's not the case, and that's what Holloway held. And so the evidence at trial was more than enough to meet that standard, and the jury properly found that. The evidence primarily can be found at docket number 2349. That's the trial transcript day when we heard testimony from both Mildred Frederick, the victim, and Ladaris Dickerson, the accomplice, who then cooperated and testified. And looking at Ms. Frederick, the victim's testimony about her experience in the moment, when this vehicle was actually being forcibly taken from her, she testified that she was scared. She emphasized she was really scared. She said that the robber pointed the gun at her. That's at page 189. Small correction to earlier. She was not just pushed out of the car. She was actually kicked out of the moving car. That's at page 190 and 191. And then she emphasized that that was while the vehicle was in motion at page 203. Based on all these circumstances, she thought her life was in danger. She testified at page 196 that she could have been dead, was her thinking at the time. And she did fight back, and she explained at page 206 that she was fighting to save herself. So clearly based on the victim's perceptions and the circumstances of the taking, there is more than enough evidence to conclude that the requisite intent was there. I think the one point of comparison is this Court's decision in United States v. Hinton, which I think both briefs cite. And the circumstantial evidence of intent judged by the actions of the robber are actually far greater in this case than they were in Hinton. And so the only way I think that Mr. Walton seeks to distinguish Hinton is by saying that, well, we had some countervailing evidence that perhaps would suggest that Mr. Walton did not want any harm to come to Mildred Frederick. But I think that there was testimony to that effect, right, that he had assured that she would not be harmed. I think that the testimony from Mr. Dickerson was that he did get some assurance of that kind by Mr. Walton. But I think, you know, the jury is the one in the best place to weigh that evidence. And the jury clearly made findings about the credibility of that testimony. And really, you've got two layers of credibility. You've got Walton might be lying to Dickerson, and then Dickerson may not be candid with the jury. And really, any argument that Walton didn't want any harm to come depends on the credibility of people saying that, depends on inferences, which we submit are unsupported. And all this credibility and inference questions are ones that are really settled by the jury's verdict. Happy to answer any more questions on the carjacking piece. If not, I do just want to briefly address the harmless error on the RICO sentencing. Because, as we say, to the extent there's an error, it was invited. It certainly was not a plain error and was not objected to in a timely fashion. But even if those things were not true, even if this Court were applying a de novo analysis and not finding invited or a plain error. Well, that, I think, goes to what's the real error here. Is it an error about instructions and verdict form, which I would think would be a form of statutory error, where the harmless error standard is easier for the government to meet? Or is it really an apprendee error? In which case, it would have to be harmless beyond a reasonable doubt. I think that Your Honor is probably correct about that. And candidly, that's not a distinction that we drew in the brief. But I think that, you know, the substance of the error really does go to the instructions. I think apprendee clearly is a way of framing it that is more favorable to the defendants. But the argument is really directed at the substance. The more I look at this, the more I just keep coming away with the idea that this isn't an apprendee error at all. The jury made a finding of fact here to enhance the sentence to the extent that there's a problem with it. It's all attributable to jury instructions or the verdict form. I think that's exactly right, Your Honor. And, again, conceding everything we could possibly concede about the proceeding. The jury did not purport to make this finding of fact. No, and the judge at each of the sentencings made very clear, Judge Thrash below, that he thought the jury's finding was perfectly clear and had no doubt about what they found, that there was a sufficient basis. And it's a question of whether, you know, the record supports that. But it's not. The jury made the finding, not the judge. Correct. Whatever finding there was. Correct. And I don't want to take up the rest of the time, but I do just want to note that that jury's finding was supported over and over and over again, beyond a reasonable doubt, by just countless pieces of evidence about not just one, not just two, but, by my count, 11 completed murders that happened as a result of this conspiracy and that were amply proven. So those included the murder of Robert Dixon by Donald Glass. I do want to dispute whether the jury acquittal on Count 18 means that we didn't prove that. I think, actually, that the opposite is true. The jury convicted Mr. Glass of Count 20, that's causing death through the use of a firearm, and that was necessarily predicated on the underlying crime of violence being Vicar murder. And so the jury actually, by finding him guilty about that, made an explicit finding that there was at least this one murder involved in this conspiracy. Another murder committed by one of the trial defendants is the Stone Mountain Inn murder of Edward Chadman that was committed by Antarius Caldwell. Multiple, multiple, multiple pieces of evidence on that. Three cooperators testified that that happened, as well as the victim's brother. Your Honors, I could go on with these, but I think I'll probably leave it there unless you have specific questions. Suffice to say that there were many completed murders, and all that means there's no serious question but that the jury would have and did find that, even if we assume any error. Thank you, Mr. Mulrow. Thank you. Mr. Wooldridge, you have two minutes. Thank you, Your Honor. The court seems to be indicating that it believes that the judge did not make any sort of decision at sentencing, and that couldn't be further from the truth. Well, the judge interpreted a verdict form and what was meant by that. Exactly. But that doesn't mean that the judge was making a finding of fact necessary to increase the sentence. But that's exactly what happened, Your Honor. And the reason that's what happened is because the ambiguous verdict form required the judge to look at it and see what the jury meant, and that's exactly what Judge Thrash did. And I quote from the sentencing hearing, After we objected, based off Apprendi, Judge Thrash says, I am convinced beyond any doubt that in returning its verdict, the jury meant that Mr. Clayton had either joined in the conspiracy or remained in this conspiracy knowing others had committed malice murder. That's Judge Thrash on the record analyzing what the jury verdict meant. The reason he had to do that is because of the jury. He's making a finding of fact. He's interpreting what the jury's finding of fact. And that's prohibited under Apprendi. You can't look at the jury. And your best case for that is? United States versus—I'm sorry, Apprendi versus New Jersey. It says in Apprendi you can't look and speculate and try to figure out what a jury verdict means because if you do that, you're the one deciding the fact. No, Apprendi's about where—we lived in a day where the Supreme Court changed the law in Apprendi, right? Yes, Your Honor. And it used to be that there were certain facts that were considered sentencing enhancement facts that judges could actually make the finding of fact. And that's what had happened there. Right. It wasn't an interpretation of a jury verdict. But in this case, that's what happened. I objected based off Apprendi, and Judge Thrash says I think this is what they meant. That is exactly what happened. Counsel, real quick, because I want to make sure this is— the government said that all defendants—and I know the judge had ruled that the objections were automatically joined unless they indicated otherwise. The government also said objections and or motions were automatically joined unless indicated otherwise. Would that also include this request of jury instructions and that type thing? Yes, Your Honor. So all of you joined in the requested jury instructions, the requested verdict form of any other defendant unless you indicated otherwise on the record? Yes, that's right, Your Honor. Okay. Thank you. And I see my time has run out. Thank you very much. Thank you, Mr. Wildridge. Mr. Wilson. Your Honors, regarding the text message of Mr. Gumbs, I would point the Court to what I argued in my brief, which is the lead prosecutor for the government, Ms. Dammers, said at the hearing in this case at document 253, transcript page 9, lines 5 through 7, she said to the Court, candidly, except for this text, we don't have any evidence that Mr. Gumbs was involved in any murder in this case. Furthermore, there was no evidence. That's a different question. As I understand, what Mr. Mulrow was arguing was that there was plenty of evidence that your client had participated and joined in the conspiracy at dates earlier than some of the murders. And he recounted evidence to support that. He recounted a tattoo. It was a Star of David tattoo. That's one thing he recounted. Mr. Gumbs was a policeman. He was screened with the police department for gang tattoos or anything like that, and he was hired with that tattoo, which he had had for years. But, Your Honor, there was no testimony of any witness in this case linking Gumbs with any act of violence in this case. All the days, all the witnesses, all the hundreds of pages, no testimony of any witness linked Mr. Gumbs with any act of violence in this case. Well, the real question is, did the evidence link him to a conspiracy? The earliest evidence linking him to a conspiracy. And at a date that preceded some of the murders that occurred here. No, Your Honor, none. Okay, we'll look at the record. Yeah, Quontavious Hurt said someone told it. What Quontavious Hurt said, he saw Mr. Gumbs. Mr. Gumbs was a policeman on the beat in Southacab where Mr. Hurt was committing his multiple murders. He said that someone told him that Mr. Gumbs was a member of the Gangster Disciples. I objected based on hearsay. I was overruled on that objection. I'll see my time to expire. Thank you, Your Honor. Thank you. Mr. Lovell, you have two minutes. Thank you. I'd like to respond to the red herring that the government put up, that that is Mildred Frederick's state of mind. I'm asking the Court to consider the intent of Mildred Frederick, the victim, who at the time of trial said that she was unfair. However, the statement she made to officers shortly after the event, she said she wasn't unfair. But regardless, her state of mind is not an element. What we're looking for is the state of mind of Mr. Walton. And Mr. Walton, not only was his state of mind expressed repeatedly by people called by the government, but he was also, if we're to believe the government's theory, that he was, that there was a hierarchy and that he was the governor of governors and that what he said was done from his state of mind, it was reasonable for him to believe that if he told his co-defendants, don't harm her, that they would not harm her. As a matter of fact, there are several quotes in my briefs that talk about the government's witnesses saying that they had every, that Walton's word was to be found. So he can't be both the governor of governors who gives orders and is responsible for those orders on most occasions, but on this particular occasion, when the last thing that he, the last involvement he has, because he's watching from across the street, the last involvement he has is to say, don't hurt her. Okay. Thank you, Counsel. Thank you, Your Honors. So I note that all three of you, Mr. Woodridge, Wilson, Mr. Lovell, were court appointed. We appreciate you accepting those appointments and discharging your duties here and in briefing. So thank you very much. That's very helpful to us. We'll move to the next case.